Irma Ruth HALFERTY, Plaintiff-Appellee.

v.

PULSE DRUG COMPANY, INC., d/b/a Pulse Ambulance Service, Defendant-Appellant,

No. 86–2466.

United States Court of Appeals, Fifth Circuit.

July 13, 1987.
Rehearing Granted.*

* See 826 F.2d 2.

Shelton E. Padgett, Kris J. Bird, Kaufman, Becker, Clare & Padgett, San Antonio, Tex., for defendant-appellant.

Gary Scarzafava, Judith A. Yacono, San Antonio, Tex., for plaintiff-appellee.

Before WILLIAMS and HILL, Circuit Judges, and MENTZ [*], District Judge.

ROBERT MADDEN HILL, Circuit Judge:

Pulse Drug Company (Pulse Drug) appeals the district court's judgment for Irma Ruth Halferty in her suit for minimum wage and overtime payments pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 et seq. We affirm in part and reverse in part and remand for further proceedings consistent with this opinion.

## I.

Pulse Drug is a family owned business that sells generic drugs to distributors. Pulse Drug also owns and operates Pulse Ambulance Service (Pulse Ambulance). Pulse Ambulance provides non-emergency transportation for disabled individuals, generally to and from their homes and their physicians or hospitals for routine treatment. In December 1981 Halferty began working for Pulse Ambulance as the company's night dispatcher. Halferty performed the job from her home, where she was "on duty" from 5:00 p.m. to 8:00 a.m. from Monday night to Thursday night, and from 5:00 p.m. Friday to 8:00 a.m. Monday. After a few months of being on duty 123 hours a week under this schedule, Halferty and Pulse Ambulance agreed to reduce her work schedule to 75 hours a week, 5:00 p.m. to 8:00 a.m., Monday night to Friday night. At the beginning of her employment, Halferty was compensated $2.50 per day, $1 per ambulance run, along with $2 per month as reimbursement for the call forwarding charges she incurred. After September 16, 1983, Halferty renegotiated

her wages to a flat fee of $230 per month. The total wages received by Halferty during her employment from December 1981 to May 1984 were $5,665.60.

Halferty's duties began each workday at 5:00 p.m. when the daytime dispatcher at Pulse Ambulance would activate its call forwarding system, causing all incoming calls to Pulse Ambulance to ring only at Halferty's home. The call forwarding would remain activated until someone at Pulse Ambulance deactivated the system the next workday morning. When Halferty was hired, she was not given any special training; another Pulse Ambulance employee came to her house, explained the ambulance operations, and gave Halferty some log sheets. Halferty began work that evening.

Halferty's job responsibilities entailed being prepared to answer and answering the telephone. When an incoming caller requested ambulance service, Halferty was required to obtain the patient's name, location, destination, and method of payment. She was to note this information and the time of the call, assign the call to a particular ambulance crew, and notify that crew of the request. The ambulance crew, in turn, was required to keep Halferty informed of its progress and its whereabouts to aid her in assigning the next call.

Halferty also received calls requesting information about the ambulance service, as well as personal calls for Pulse Ambulance's owners, for the ambulance crews, and for other Pulse Ambulance employees. Between calls, Halferty was free to engage in any personal activities, so long as they did not interfere with her ability to respond to the phone. Thus, between calls she cleaned house, watched television, read, entertained friends, and slept. Halferty also pursued other independent business endeavors while at her home, including the raising of pedigree poodles, crocheting, baby-sitting, and laundering. Halferty was able to leave her home, but she was responsible for making sure that the phone would be answered by someone else, either at her

* District Judge of the Eastern District of Louisi-       ana, sitting by designation.

home or at a third number to which she would have the calls forwarded.

Pulse Ambulance's parent company, Pulse Drug, treated Halferty as an employee on its financial and tax records. Halferty received W–2 forms listing Pulse Drug as her employer, and Pulse Drug listed Halferty on its reports to the Texas Employment Commission, the IRS, and the Social Security Administration. Pulse Drug withheld F.I.C.A. taxes on Halferty's behalf, and paid those amounts and the employer's matching amounts to the IRS. Pulse Drug's accountant pointed out to Mr. Martinez, Pulse Ambulance's owner, that Halferty was being treated as an employee on the company's books.

Halferty did not rely on her Pulse Ambulance employment as her main means of sustenance. Both before and after her period of employment with Pulse Ambulance, Halferty was almost completely dependent on aid from the federal government for her living expenses. As of September 1981 Halferty was receiving $643 per month in food stamps, AFDC payments, Lease Housing Program payments, and disability benefits to defray utility costs.

In early 1984 Halferty filed a complaint with the Wage and Hour Division of the Department of Labor (DOL). The DOL began an investigation relating to Halferty's wages. During this time Pulse Ambulance's owner requested that Halferty sign a statement verifying that she was an independent contractor. Halferty refused, and shortly thereafter, on May 21, 1984, Halferty was fired. Three days later the DOL informed Pulse Drug that it owed Halferty $28,128.75 in back wages. In November 1984 DOL informed Halferty that Pulse Drug refused to pay the back wages. On December 10, 1984, Halferty filed suit to recover her unpaid compensation.

In a bench trial the district court found that (1) Halferty was an employee within the meaning of the FLSA and therefore was entitled to minimum wage and overtime payments, (2) under the appropriate statute of limitations she was entitled to recover for two years of lost wages, and (3) she was entitled to recover reasonable attorney's fees for 200 hours at $100 per hour.[1] Judgment was entered in favor of Halferty in the amount of $27,336.03 and attorney's fees in the amount of $20,000.

Pulse Drug subsequently instituted this appeal, claiming error in each of the above findings and conclusions of the district court. Pulse Drug also contends that the district court did not properly apply the exception to the FLSA's minimum wage requirements for homeworkers, 29 C.F.R. § 785.23, or the exception for time spent "waiting to be engaged."

## II.

The first issue we address is whether, under the FLSA, Halferty is an independent contractor or an employee.[2] The FLSA provides little guidance in making this determination. It defines "employee" as one "employed by an employer." 29 U.S.C. § 203(e)(1). The definition of employer likewise sheds little light on the problem. "Employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA, therefore, is of no help in deciding whether Halferty is an employee of Pulse Ambulance or merely an independent contractor.

The Supreme Court has provided some direction for distinguishing between employees and independent contractors. *See Bartels v. Birmingham,* 332 U.S. 126, 67

1. Prior to and including the four day trial, the district court found that Halferty's counsel spent 200 hours on the case. After hearing testimony from Halferty's counsel that a reasonable rate for his services was $150 per hour, and from an expert witness on legal fees for labor-related cases that reasonable rates in San Antonio ranged from $150 per hour to $200 per hour, the district court determined that a rate of $100 per hour was reasonable in this case.

2. The proper categorization is important because the protection of the FLSA extends only to employees, and thus an employer can avoid the minimum wage and overtime requirements of the FLSA by establishing that a particular person is an independent contractor and not an employee. *See Weisel v. Singapore Joint Venture, Inc.,* 602 F.2d 1185, 1188 (5th Cir.1979).

S.Ct. 1547, 91 L.Ed. 1947 (1947); *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947). This circuit has adopted its framework for making the employee/independent contractor determination from those cases. Thus, we have often used a five part test established from *Silk*. This test includes examining (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the employee and employer; (3) the degree to which the employee's opportunity for profit and loss is determined by the employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *See, e.g., Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043 (5th Cir.1987). No one particular element, however, is necessarily determinative, *see Castillo v. Givens*, 704 F.2d 181, 190 (5th Cir.), *cert. denied*, 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983), nor are the five factors the only ones that the district court can consider. *Mr. W Fireworks*, 814 F.2d at 1043.

Moreover, the *Silk* factors should not be mechanically applied; rather, the court must use these factors as a guide to decide the ultimate issue of whether as a matter of "economic reality" a particular worker is an employee. *See Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1189 (5th Cir.1979). The "economic reality" of whether an employee/employer relationship exists for purposes of the FLSA turns on the "dependency" of the person upon the business for employment. *Id.* While applying the *Silk* test, then, the court must keep in mind the ultimate question of whether "the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its ambit." *Usery v. Pilgrim Equipment Company, Inc.*, 527 F.2d 1308, 1311 (5th Cir.), *cert. denied*, 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976). *See also Castillo*, 704 F.2d at 190 ("The determinative question is whether the person is 'dependent upon finding employment in the business of others.'" (quoting *Fahs v. Tree-Gold Co-op Growers*, 166 F.2d 40, 44 (5th Cir.1948))).[3]

With these considerations in mind, we must examine the working relationship of the parties involved. Upon reviewing the record, we believe that the district court properly resolved this issue.[4]

The first factor we examine is the degree of control over the putative employee exercised by the employer. Pulse Ambulance argues that this factor cuts in its favor. The bases for this assertion are the district court's findings that (1) Pulse Ambulance did not exercise control over Halferty as to whom she could employ to assist her in receiving calls at home and/or dispatching ambulance drivers and (2) all equipment Halferty used was under her sole control in her home, and the location, manner, and

---

**3.** In answering the "dependency" question, this court has articulated another mode of analysis similar to *Silk*. In *Castillo* the court stated: "Two factors have emerged as critically significant in answering this [dependency] question: (1) how specialized the nature of the work is, and (2) whether the individual is 'in business for himself.'" *Castillo*, 704 F.2d at 190 (quoting *Mitchell v. John R. Cowley & Brothers, Inc.*, 292 F.2d 105, 108 (5th Cir.1961)) (footnote omitted). We do not believe that this is a different standard, but rather is merely a distillation of the elements of the "dependency" inquiry. Indeed, the *Castillo* court recognized this: "The cases tend to crystallize the [*Silk* and *Rutherford*] criteria into the two basic inquiries listed above." *Id.* at 190 n. 19. Moreover, in *Castillo* the court still examined the *Silk* factors. *See id.* at 190–92. Halferty concentrates on the *Castillo* two-part test, but Pulse Ambulance focuses on the *Silk* factors. We do not believe that *Castillo* is a different standard, but is basically just the *Silk* criteria re-grouped. Moreover, we do not believe that the two tests would lead to a different result. The bottom line is still whether Halferty was, as a matter of economic reality, dependent upon Pulse Ambulance for her employment. In addressing this issue, we will review it focusing on the *Silk* factors.

**4.** The findings of fact as to the individual *Silk* factors (as well as any factors examined under *Castillo*) are questions of fact that can be set aside only if clearly erroneous. *See Mr. W Fireworks*, 814 F.2d at 1044. The ultimate determination of employee status, however, is a finding of law subject to *de novo* review. *Id.* at 1045.

means of using such equipment were left to her discretion.

While we do not disagree with these findings, we do disagree with the emphasis that Pulse Ambulance applies to them. We first point out that Pulse Ambulance did control when Halferty was to answer the phone, what she was required to say, what information she was to retrieve, and what action she was then to take. Also, the fact that Halferty *could* freely employ others to assist her does not matter. In fact she did not, and it is only what activity that she actually engaged in that is of any consideration. *See Mr. W Fireworks*, 814 F.2d at 1047. Moreover, even if Halferty had employed others to assist her, that fact is not dispositive, *cf. Beliz v. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1328 (5th Cir. 1985) (recruiting a work crew for a farmer not indicative of independent contractor status), and Pulse Ambulance would still have been able to control the way that any other workers would have answered the phone. Finally, we do not believe that having control of how one uses phone equipment when he or she answers the phone is a significant degree of control to place that person in an independent contractor status.

The second criteria that we consider is the extent of the relative investments of the employee and employer. In this regard, Pulse Ambulance sets forth a number of "investments" made by Halferty. First, it cites the fact that since Halferty provided the answering service out of her leased home for 75 hours per week out of a 168 hour week, 45% of the week could be allocated to the work usage. Thus, the investment value of the home was 45% of the rental amount of $250 per month for 30 months, or a total of $3,375. Plus, Halferty's average monthly phone bill was $25 for the 30 months, multiplied by the 45%, for a total of $337.50. Pulse Ambulance similarly figures in an average monthly utility bill of $70.57 for 30 months, for a total of $951.88. Finally, Pulse Ambulance adds in $3 worth of notebooks and $60 in gas Halferty used to drive to pick up her checks. The total investment set forth by Pulse Ambulance for Halferty was $4,727.38. Contrasted to this investment was Pulse Ambulance's contribution of $60 in call waiting, a radio scanner valued at $150, and a radio valued at $500, for a total of $710. Pulse Ambulance thus figures that Halferty provided an investment of 86.5% ($4,727.38) and it provided only 13.5% ($710), and therefore this investment element indicates an independent contractor relationship. We disagree.

Halferty did not "invest" in her home (or the utilities that go with it) because of the desire to run an answering service. She was living in her home, paying the phone bill and the utilities prior to starting to answer phones for Pulse Ambulance and she would have incurred those expenses regardless of whether she worked as a dispatcher at the Pulse Ambulance facilities instead of her home, or never engaged in answering phones at all. There is no evidence that the expenses increased as a result of this work, or that Halferty modified her home to enable her to provide better service. It appears that the only expense Halferty incurred in providing this service was a $3 notebook and, arguably, the $60 in gas. Halferty just did not make any significant investment in any facilities to assist her in providing an answering service.

The next factor to be considered is Halferty's ability to influence the making of a profit or loss. Pulse Ambulance first points out that Halferty could affect her profit and loss by requesting more hours of work or by renegotiating her salary. However, any employee can renegotiate his or her salary; doing so does not make that person an independent contractor.

Pulse Ambulance also asserts that during the first 21 months Halferty's income depended upon the number of ambulance runs made. Since Pulse Ambulance had a great many repeat customers, Pulse Ambulance argues that Halferty could influence the patients' continued business by the way she handled those clients, and thus she could increase her opportunity for profit by developing more repeat business.

We find no merit to this argument. Under this interpretation, a worker with any sort of incentive plan or volume-based pay

ceases to be an employee. For example, a McDonald's cashier or a grocery store clerk who increases the volume of business by being pleasant would thereby become an independent contractor by participating in a profit-sharing plan. We have rejected such an interpretation of the FLSA. *See, e.g., Mr. W Fireworks*, 814 F.2d at 1050 ("Although experience and courtesy to customers may to some degree enhance an operator's commission, this is equally true of all commissioned employees and of employees earning gratuities."). *See also Beliz*, 765 F.2d at 1328 ("Of course, Galan could and did make a profit out of the work of his crew. But this was not based on risk of loss of any capital investment or his entrepreneurial skill but was simply a piece-rate override....").

The fourth factor we examine is the skill required by the worker in the operation of the business activity. We believe that this element also points to an employee/employer relationship. Both Halferty and another dispatcher, Mrs. Elliot, testified that the job of night dispatcher involved no special skills or training—neither were given any training before their first night on the job. We agree that no special skills are involved. Halferty needed no knowledge of any special equipment to perform her duties. She simply answered the phone, took down pertinent information, and relayed that information by phone to waiting ambulance crews. The lack of specialization indicates that Halferty was an employee, not an independent contractor. *Cf. Beliz*, 765 F.2d at 1328; *Castillo*, 704 F.2d at 191; *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666 (5th Cir.1983). Pulse Ambulance argues that Halferty's unique understanding of disabled individuals was a skill, and that locating ambulance drivers was also a skill. The ambulance drivers, however, called her to announce their locations. Moreover, even assuming that understanding disabled individuals is a skill, we do not believe that it significantly points to an independent contractor relationship given all the other indicia of employee status. In sum, Halferty's level of skills indicate that she was an employee.

The last element to consider is the permanency of the relationship. In this regard Pulse Ambulance makes no argument, apparently conceding this factor. Pulse Ambulance properly does so. Halferty clearly was a permanent worker of Pulse Ambulance.

■ In conclusion, we hold that the findings by the district court are not clearly erroneous. We also hold that when these factors are added together, the district court's legal conclusion that Halferty is an employee of Pulse Ambulance is correct. Pulse Ambulance, however, argues that the economic reality of its relationship with Halferty establishes that Halferty was an independent contractor. We do not agree.

The crux of Pulse Ambulance's argument is that Halferty did not economically depend on the wages paid by Pulse Ambulance for her survival. During the two and one-half years she was employed by Pulse Ambulance, Halferty earned $5,665.60 for her work. During that time she also received approximately $13,000 in benefits from the federal government, $720 from her foster son, Chico Henderson, and $950 that she made by crocheting and raising poodles. Pulse Ambulance claims that Halferty must have been dependent on these funds and not on its wage payments to her. Essentially, this is an argument that they paid her so little that she could not possibly have established the requisite economic dependency under the FLSA.

Pulse Ambulance misconstrues the meaning of this court's inquiry into economic dependence. When we describe the relevant query as "whether the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit," *Weisel*, 602 F.2d at 1189, the dependence at issue is dependence on that job for that income to be continued and not necessarily for complete sustenance. As we have recently stated:

Economic dependence is *not* conditioned on reliance on an alleged employer for one's primary source of income, for the necessities of life. Rather, the proper

test of economic dependence mandates consideration of all the factors, and in light of such consideration "examines whether the workers are dependent on a particular business or organization *for their continued employment*" in that line of business. *Donovan v. Dial America Marketing*, 757 F.2d [1376] at 1385 (citing *Pilgrim Equipment*, 527 F.2d [1308] at 1311. (emphasis added). *Mr. W Fireworks*, 814 F.2d at 1054. Thus, it is not dependence in the sense that one could not survive without the income from the job that we examine, but dependence for continued employment. Under Pulse Ambulance's interpretation, wealthy persons could never be employees under the FLSA, and employers could avoid liability to workers simply by paying them so low a wage that the workers are forced to live on other sources of income. We decline to adopt such a view. We conclude that as a matter of economic reality Halferty is an employee and not an independent contractor.[5]

### III.

Having concluded that Halferty is an employee under the FLSA, we now turn to Pulse Ambulance's argument that the district court did not properly calculate the hours she worked because it did not apply either the homeworker's exception or the "waiting to be engaged" doctrine.

The homeworker's exception is one of three sections contained in the Code of Federal Regulations that addresses the problem of under what conditions an employee is considered to be working even though some of his time is spent sleeping or in other activities. *See* 29 C.F.R. § 785.-20. The homeworker's exception deals specifically with employees either residing on the employer's premises or working at home.[6]

The homeworker's exception provides: Section 785.23. Employees residing on employer's premises or working at home.

An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is of course difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted. This rule would apply, for example, for the pumper of a stripper well who resides on the premises of his employer and also to a telephone operator who has the switchboard in her own home. (*Skelly Oil Co. v. Jackson*, 194 Okla. 183, 148 P.2d 182 (Okla.Sup.Ct. 1944); *Thompson v. Loring Oil Co.*, 50 F.Supp. 213 (W.D.La.1943)).

29 C.F.R. § 785.23. A DOL regulation opinion offers an additional explanation of the homeworker's exception:

Section 785.23 of part 785 is applicable to an "on-call" employee who is required by his employer to remain at his home to receive telephone calls from customers when the Company office is closed. Where an employee performs services for his employer at home and yet has long periods of uninterrupted leisure during which he can engage in the normal activities of living, the Department of Labor will accept any reasonable agreement of the parties for determining the

---

5. The tax treatment of Halferty supports this conclusion. We agree with Pulse Ambulance that the designation of workers as employees or independent contractors for tax purposes is not determinative of the workers' legal status. *Cf. Robicheaux*, 697 F.2d at 667. Nevertheless, Halferty's tax treatment can be considered as a factor in deciding her status. We believe that the tax treatment of Halferty is just one more factor that supports the conclusion that Halferty

is an employee and not an independent contractor.

6. The other two sections address the employee who works at the employer's place of business, but does not reside there, either for less than 24 hours, *see* 29 C.F.R. § 785.21, or for 24 hours or more a week. *See* 29 C.F.R. § 785.22. Neither of these sections would apply to the present case.

number of hours worked. This agreement should take into account not only the actual time spent in answering the calls but also some allowance for the restriction on the employee's freedom to engage in personal activities resulting from the duty of answering the telephone.

Department of Labor, Wage-Hour Administrator Opinion Letter (March 18, 1968). Based on the homeworker's exception, Pulse Ambulance argues that Halferty was exempt from coverage under the FLSA, that the agreement it entered with her should control the employee/employer relationship, and thus Halferty is not entitled to minimum wage or overtime payments.[7]

■ Similarly, Pulse Ambulance asserts that under the "waiting to be engaged" exception Halferty was properly compensated. This doctrine was established in *Armour & Co. v. Wantock*, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118 (1944) and *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Basically, it provides that "waiting time" may also be "working time," and therefore compensable under the FLSA. *See Skidmore* at 136, 65 S.Ct. at 163; *Armour* at 133, 65 S.Ct. at 168. Thus, when idle time is spent predominantly for the benefit of the employer, not the employee, the employee is engaged to be waiting, not waiting to be engaged, and is entitled to compensation. Conversely, if the time primarily benefits the employee, the employee can be considered to be waiting to be engaged, and should only receive compensation for the actual work time.[8]

Whether either the homeworker's exception or the waiting to be engaged doctrine would apply is dependent upon the agreement of the parties. *See* 29 C.F.R. § 785.-23 ("It is of course difficult to determine the exact hours worked under these circumstances [the homeworker's exception] and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted."); *Skidmore*, 323 U.S. at 137, 65 S.Ct. at 163, 89 L.Ed. at 128 (the resolution of the waiting to be engaged issue "involves scrutiny and construction of the agreements between the particular parties."). In this case the district court found that Halferty and Pulse Ambulance initially agreed that Halferty would perform her duties for Pulse Ambulance between 5:00 p.m. and 8:00 a.m., Monday through Friday, and from 5:00 p.m. on Friday through 8:00 a.m. on Monday morning. These hours were later changed to 5:00 p.m. to 8:00 a.m., Monday through Friday.[9]

The district court, however, made no explicit findings regarding whether the parties agreed that Halferty was being compensated for all the time, or only for the time that Halferty was actually working. It may be that the court implicitly found

---

**7.** Even if the homeworker's exception is applicable, Pulse Ambulance is incorrect in its assumption that it is thus exempt from the FLSA. This exception merely exempts certain time from needing to be calculated for purposes of the FLSA. *See* 29 C.F.R. § 785.23 ("An employee who resides on his employer's premises on a permanent basis or for extended periods of time *is not considered as working all the time he is on the premises.*") (emphasis added).

**8.** Pulse Ambulance argues, however, that the waiting to be engaged doctrine also exempts it from needing to be in compliance with the FLSA. This position is incorrect; this doctrine would also only lower the hours that an employee would need to be compensated for.

We point out that the waiting to be engaged doctrine has been codified in the Code of Federal Regulations. *See generally* 29 C.F.R. § 785.14 to 785.17. The codification is apparently based on *Armour* and *Skidmore;* each section cites,

among other decisions, either *Skidmore* or *Armour.* Section 785.15 addresses the situation when an employee is engaged to wait. *See* 29 C.F.R. § 785.15. Section 785.16 deals with the employee who is waiting to be engaged. *See* 29 C.F.R. § 785.16. Finally, section 785.17 delineates the times when an employee who is on call is actually working. *See* 29 C.F.R. § 785.17. These sections are designed to deal with employees who do not either reside on the employer's premises or work at their houses. For example, this would appear to cover the Pulse Ambulance drivers.

**9.** The findings of the district court relating to any agreement of the parties is a fact-finding subject to the clearly erroneous standard of review. *See, e.g., Skidmore*, 323 U.S. at 136–37, 65 S.Ct. at 162–63, 89 L.Ed. at 127–28 ("whether in a concrete case such [waiting] time falls within or without the [FLSA] is a question of fact to be resolved by appropriate findings of the trial court.").

that neither the homeworker's exception nor the waiting to be engaged doctrine was applicable, and thus all time was compensable. This interpretation of the court's findings is based on its findings that Halferty initially was on duty for 123 hours per week, and then later for 75 hours per week. Thus, in not segregating out time for sleeping or other activities, the court could have been concluding that neither doctrine was applicable.

There is, however, a conflict with the interpretation that the court was concluding that neither doctrine was applicable. This conflict stems from the court's findings that Halferty was free during part of this working time to sleep, crochet, entertain friends, raise poodles, and watch television. These findings are some evidence that the homeworker's exception may apply. *See* 29 C.F.R. § 785.23 ("An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties.... This rule would apply ... to a telephone operator who has the switchboard in her house."). The Supreme Court recognized in *Skidmore* that such activities may not be compensable as working time:

> The general tests which [the DOL Wage and Hour Division Administrator] has suggested point to the exclusion of sleeping and eating time of these employees from the workweek and the inclusion of all other on-call time: although the employees were required to remain on the premises during the entire time, the evidence shows that they were very rarely interrupted in their normal sleeping and eating time, and these are pursuits of a purely private nature which would pre-

sumably occupy the employees' time whether they were on duty or not and which apparently could be pursued adequately and comfortably in the required circumstances; the rest of the time is different because there is nothing in the record to suggest that, even though pleasurably spent, it was spent in the ways the men would have chosen had they been free to do so.

*Skidmore*, 323 U.S. at 139, 65 S.Ct. at 164.[10]

■ In sum, the district court did not make findings whether either doctrine was applicable; i.e., whether the parties agreed that such free time was to be compensated time. Without such findings, we have no basis upon which to review this issue, and therefore must remand this issue to the district court.[11] Once the court determines what time Halferty should be compensated for, it should then determine the amount of minimum wage and overtime payments that should be made to Halferty based on this time.

## IV.

■ Pulse Ambulance next contends that the district court erred in its application of the statute of limitations to this case. The statute of limitations for a violation of the FLSA is provided for in 29 U.S.C. § 255:

> Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act—
>
> (a) if the cause of action accrues on or after May 14, 1947—may be commenced within two years after the cause of action accrued, and every

---

10. The district court's findings would also apply to the waiting to be engaged doctrine.

11. In making the inquiry as to whether free time such as sleeping and eating is compensable, the court should keep in mind the instructions of the Supreme Court in *Skidmore:* "This involves scrutiny and construction of the agree-

ments between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances." *Skidmore*, 323 U.S. at 137, 65 S.Ct. at 163.

such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action acrued; ....

A cause of action accrues at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed. *See Hodgson v. Behrens Drug Company*, 475 F.2d 1041, 1050–51 (5th Cir.), *cert. denied*, 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973). An action is commenced for the purposes of section 255 when the complaint is filed. *See* 29 U.S.C. § 256. Halferty filed her complaint on December 10, 1984. Therefore, Halferty should have been able to recover damages for any violation of the FLSA for either the two-year period of December 10, 1982, to December 10, 1984, or if the violation was willful for the three-year period from December 10, 1981, to December 10, 1984.

The district court held that the two-year statute of limitations applied because it believed the violations at issue in this case were not willful. Applying this limitations period, the court awarded damages for the period from May 21, 1982, to the date Halferty was terminated, May 21, 1984. This time period was incorrect. If the two-year period applies, Halferty can only recover from December 10, 1982, to December 10, 1984.

Halferty argues, though, that the violation of the FLSA was willful, and thus the three-year limitation period should apply. We agree. We have held that to determine if a violation of the FLSA is willful, "the test is whether the employer knew the FLSA was in the picture.... If the employer merely suspects that his actions might violate the Act, then the violation is willful." *Castillo*, 704 F.2d at 193.

■ Halferty asserts that Pulse Ambulance knew the FLSA was "in the picture" because it received, consulted, and in good faith relied upon a DOL bulletin discussing 29 C.F.R. § 785.23, the homeworker's exception. The district court believed that such a good faith reliance on the exception mandated a conclusion that the violation was not willful. This is an incorrect view of the law; Pulse Ambulance's good faith interpretation of what the law is cannot save it. Consultation of a bulletin that directly deals with the FLSA clearly shows that Pulse Ambulance knew that the FLSA was in the picture. Just the fact that Pulse Ambulance knew that the FLSA might apply is enough to make the violation willful, even though it thought in good faith that the homeworker's exception exempted it from the FLSA. *See Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1141–42 (5th Cir.1971) (a violation of the FLSA committed in good faith based on counsel's advice is still willful), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972). Thus, we must conclude that Pulse Ambulance's violation was willful, and the three-year statute of limitations applies.

### V.

■ The last issue that we must address is whether the district court erred in its award of attorney's fees. Pulse Ambulance argues that the court erred in its award because it did not consider all the factors articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). In *Johnson* we established twelve factors that district courts must consider in deciding the amount of attorney's fees to award to a prevailing plaintiff.[12] The specific findings on each indi-

---

12. The twelve factors are:
   (1) the time and labor required,
   (2) the novelty and difficulty of the questions,
   (3) the skill requisite to perform the legal service properly,
   (4) the preclusion of other employment by the attorney due to acceptance of the case,
   (5) the customary fee,

   (6) whether the fee is fixed or contingent,
   (7) time limitations imposed by the client or the circumstances,
   (8) the amount involved and the results obtained,
   (9) the experience, reputation, and ability of the attorneys,
   (10) the "undesirability" of the case,

vidual *Johnson* factor involves a fact determination reviewable under the clearly erroneous standard. *See Brantley v. Surles,* 804 F.2d 321, 327 (5th Cir.1986). In this case, the district court did not delineate its findings with regard to any particular *Johnson* factor,[13] and addressed the entire issue in a summary manner. Thus, there are insufficient findings for us to properly review this issue and we must remand the case to the district court to properly consider the twelve *Johnson* factors and enter sufficiently detailed findings relating to these factors to allow us to review them.[14]

## VI.

For the foregoing reasons, we AFFIRM the district court's conclusion that Halferty was an employee of Pulse Ambulance. We VACATE the court's calculation of the hours worked by Halferty and REMAND for a consideration of whether the homeworker's exception or the waiting to be engaged doctrine apply and thus the hours worked should be reduced. We REVERSE the court's determination of the appropriate statute of limitations period and REMAND for a calculation of the wages owed in the three-year period. Finally, we VACATE the court's calculation of attorney's fees and REMAND for a consideration of

    (11) the nature and length of the professional relationship with the client, and
    (12) awards in similar cases.
*Johnson,* 488 F.2d at 717–19.

**13.** The court's findings regarding the attorney's fees are as follows:

> In bringing her suit, the Plaintiff engaged the services of Gary Scarzafava, P.C. Plaintiff's attorney performed 200 hours of service through the end of the trial of this cause on the morning of April 14, 1986. The Fair Labor Standards Act issues involved were novel, difficult, and unique and required knowledge of labor law and the skill to find the law of the issues involved. Because of the 200 hours of time invested, Plaintiff's counsel was unable to take other offered employment because of obligations to the Plaintiff. Plaintiff was unable to pay an attorney's fee and any recovery of such a fee by Plaintiff's attorney was to be contingent upon the success of the cause of action. This necessitated waiting for

all the *Johnson* factors and for findings of fact as to those factors.

payment. The 200 hours expended in the preparation and presentation of this case was both reasonable and necessary.

After evaluating the facts of this case, this Court finds that Plaintiff's counsel should be compensated at the rate of $100.00 per hour for each of the hours of service he performed in this case. *See Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974). Thus, the Plaintiff is entitled to be paid by the Defendant a reasonable attorney's fee in the amount of $20,000.00.

**14.** We point out that the twelve factors should be considered within the framework outlined in *Copper Liquor, Inc. v. Adolph Coors,* 684 F.2d 1087 (5th Cir.1982). Under *Copper Liquor* the district court should: (1) ascertain the nature and extent of the services supplied by the attorney; (2) value the services according to the customary fee and quality of the legal work; and (3) adjust the compensation on the basis of the other *Johnson* factors that may be of significance. 684 F.2d at 1092.