Robert FEGLEY, Plaintiff,

v.

Ronald B. HIGGINS, Sr., Foremost Industries, Inc., C.M.R.A., Inc., CMR Associates, a Michigan general partnership, and Cynthia Higgins, Ronald Higgins, Jr. and Marcy Pakizer, Jointly and Severally, Defendants.

No. 89–71819.

United States District Court, E.D. Michigan, S.D.

March 1, 1991.

Theodore Apperwall, Michael Alaimo, Detroit, Mich., for plaintiff.

Ralph Musilli, Clair Shores, Mich., for defendants.

## MEMORANDUM AND ORDER

COHN, District Judge.

### I.

This case involves a claim for unpaid overtime wages under federal and state law. Plaintiff Robert Fegley (Fegley) alleges that he was improperly denied overtime compensation by defendant Ronald Higgins, Sr. (Higgins); the companies run by Higgins, Foremost Industries, Inc. (Foremost) and CMRA, Inc. (CMRA); and CMR Associates (CMR), a general partnership composed of Higgins's wife Cynthia, his son Ronald Jr., and his daughter Marcy Pakizer. Fegley seeks recovery under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*; under the Michigan Minimum Wage Act, Mich.Stat.Ann. § 17.255(1) *et seq.* [M.C.L.A. § 408.381 et seq.]; and in quantum meruit.

Now before the Court are the parties' cross motions for summary judgment. Defendants argue that they are not subject to the FLSA because CMR is not an "enterprise," as defined by the FLSA, and because Fegley was employed as an indepen-

dent contractor.[1] In response, Fegley argues that CMR is merely the predecessor of CMRA, which is clearly an enterprise under the FLSA, and that he was an employee of CMR, CMRA, and Foremost. Based on this argument, Fegley seeks summary judgment on the issue of defendants' liability. Because the Court agrees, Fegley's motion is GRANTED, and the defendants' motion is DENIED.

## II.

The following facts are not in dispute.

### A.

CMR was a general partnership set up by Higgins to sell automotive prototype parts. The partners in CMR were Higgins's son, Ronald Higgins, Jr.; his wife, Cynthia Higgins; and his daughter, Marcy Pakizer. Although Higgins was not a named partner, he was CMR's principal source of business and a CMR employee. CMR itself produced nothing. Once it successfully bid on a contract, it would send out the work of manufacturing the prototype parts to manufacturing companies and individuals like Fegley, whom defendants refer to as "independent outside contractors."

CMR incorporated in June 1988, becoming known as CMRA, Inc. The general partners in CMR and Higgins became the shareholders of CMRA, Inc. CMRA provided the same services that CMR had provided to companies involved in the production of automotive prototype parts. Both, through the work of Ronald Higgins Sr., obtained contracts to provide fabricated prototype parts.

Higgins incorporated Foremost in January 1988 for the purpose of providing a manufacturing or production company to do production work for CMR and, later, for CMRA. However, Foremost did not begin operations until April 1988 and did not hire employees until May 1988. The shareholders of Foremost are the same as the shareholders of CMRA. Both CMRA and Foremost maintain their company records at the offices of Foremost. CMR, CMRA, Foremost, and Higgins use the same bank and accountant. CMRA and Foremost jointly purchase offices supplies. Higgins is the only member of the Board of Directors for both CMRA and Foremost. He is also the President of both CMRA and Foremost. Higgins and his wife were employees of both CMRA and Foremost in 1988 and 1989. Higgins was responsible for the day-to-day operations of, and made all major decisions for, CMRA and Foremost, including the hiring and firing of employees and selection of outside service contractors.

The companies were further intertwined by loan transactions. CMRA loaned $37,-437.77 to Higgins and his wife. Higgins loaned $28,182.12 to Foremost. CMRA loaned $354,676.01 to Foremost. CMRA and Foremost jointly purchased Dick's Polishing, which handled the buffing of parts for Higgins and Foremost. Higgins loaned Foremost $1500 toward the purchase.

### B.

Fegley performed work for CMR between January 1, 1988 and May 31, 1988. He also worked for Foremost between June 1, 1988 and April 3, 1989. Ronald Higgins Sr. personally hired Fegley as an outside service contractor for CMR and as an employee of Foremost.

While fabricating parts for CMR, Fegley received a lump sum payment of $1150 in March 1988. The payment took the form of a personal check made out by Higgins with the notation "loan" written on it. The payment was subsequently reported by CMR to the Internal Revenue Service as income. Fegley has not repaid the money. While working for CMR, Fegley also collected unemployment compensation. He has since repaid the Michigan Employment Security Commission $5809 in improperly paid unemployment compensation. At a later date, Fegley also received a lump sum payment of $400, which he used to pur-

---

1. The provisions of the FLSA and the Michigan Minimum Wage Act relating to the subject matter of the motions before the Court are essentially the same. Therefore, the Court's analysis will focus only on Fegley's FLSA claim.

chase automobile tires. CMR kept no records of the time that Fegley worked. According to Fegley, he sometimes worked more than 40 hours per week.

Some of the outside service contractors were paid by CMR or CMRA; others were paid by personal check from Higgins or his wife; and the remainder were paid by Foremost. Each received compensation at a rate negotiated individually with Higgins and was issued an Internal Revenue Service form 1099 as a record of annual income at the end of the year. While working for CMR and CMRA, some outside service contractors also worked for other companies fabricating automotive prototype parts. None of the individual outside service contractors were incorporated. None of them shared in CMRA's profits. None of them invested in CMRA. None of them determined what type of part to manufacture. Higgins could terminate an outside service contractor whose performance was unsatisfactory.

Between January 1, 1988 and May 31, 1988, CMR arranged to have individual outside service contractors, including Fegley, fabricate and/or finish automotive prototype parts. The outside service contractors performed the same work as the employees of Foremost. Indeed, some of them, like Fegley, eventually became Foremost employees. Some of the outside service contractors worked at home. Others worked at a site arranged by Higgins at Westco Metalcraft, Inc.

The outside service contractors who fabricated prototype parts were given everything needed to make the parts, including the necessary material or semi-finished part and part specifications, except for hand tools. They were paid by the piece. In order to fabricate a part, an outside service contractors would hammer the part into the prescribed shape using a mold and blueprints provided by Higgins. After hammering the part into the proper shape, it was then trimmed with hand tools such as a hammer and tin snips. Higgins arranged to have fabricated parts picked up from the homes of the outside service contractors and taken to other outside service contractors for finishing. CMR paid for telephone charges, legal fees, office supplies, materials, truck rental, and labor incurred in fabricating and finishing the parts.

During the time that Fegley worked for Foremost, all of the metal model makers were paid on an hourly basis except for him. He received weekly compensation of $750, regardless of the number of hours that he worked. Fegley did the same work as the other metal model makers. Foremost kept no records of the hours that he worked. According to Fegley, some weeks he worked more than 40 hours at Foremost.

### III.

#### A.

The FLSA provides, in pertinent part, that:

> Any establishment that has as its only regular employees the owner thereof or the parent, spouse, child or other member of the immediate family of such owner shall not be considered to be an enterprise engaged in commerce or in the production of goods for commerce or a part of such an enterprise.

29 U.S.C. § 203(s)(2). Based on this language, defendants argue that Fegley cannot state an FLSA claim against either CMR or CMRA. According to defendants, CMR employed only Higgins. Fegley was an independent contractor. Therefore, CMR cannot be liable for unpaid wages. While defendants concede that CMRA might be liable as a successor to CMR, they argue that there is simply no way that the FLSA can apply to CMR.

■ Both sides agree that the test to determine whether an individual may be considered an independent contractor or an employee for FLSA purposes is expressed properly in *Halferty v. Pulse Drug Co.*, 821 F.2d 261, 265 (5th Cir.1987) (citing *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947)). The five factors to be examined when making such a determination are:

1) the degree of control exercised by the alleged employer; 2) the extent of the relative investments of the employee and employer; 3) the degree to which an employee's opportunity for profit and loss is determined by the employer; 4) the skill and initiative required in performing the job; and 5) the permanency of the relationship.

*Halferty*, 821 F.2d at 265. However, the five factors should not be mechanically applied but, rather, used as a guide in determining whether the "economic reality" of the situation dictates that a worker is an employee. *Id.*

■ Upon review of the five factors, the following is clear in this case. First, CMR, through Higgins, exercised extensive control over the fabrication of parts by outside contractors like Fegley. Higgins entered into the contracts for the prototype parts. He procured work space (on occasion), materials, and most tools. He arranged for delivery and polishing of the finished parts. Second, Higgins invested significantly in CMR while outside contractors like Fegley needed only to acquire their own hand tools. Third, Fegley had no control over his own profit or loss; he simply fabricated the parts that were given to him. He had no control over the number or size of the parts contracts negotiated by Higgins. Fourth, while Fegley's job required certain specialized knowledge, a tremendous amount of skill and initiative were not necessary. The work was repetitive piece work. The parts were fabricated according to Higgins's instructions. Higgins checked the parts to make sure that they were made properly. Fifth, although Fegley's position at CMR was analogous to that of an at-will employee, it was no different from his status at Foremost.

In order to assess the economic reality of a worker's situation, as reflected in the five-factor analysis, the Court must consider the dependency of the person upon the business for continued employment. *Id.* That is, it must determine whether Fegley was so dependent on CMR that he would not have worked but for the opportunity to work with CMR. *Id.* at 268. Defendants argue that Fegley did not exhibit the requisite dependency because CMR was not the primary source of Fegley's income between January 1, 1988 and May 31, 1988. During that time, he received more money in unemployment compensation than he received in compensation from CMR. Defendants further contend that Fegley did not depend on CMR for continued employment in his chosen line of business because he worked in the same business both before and after his relationship with CMR. The Court disagrees. Fegley was able to qualify for unemployment compensation because he had been laid off from work in the same type of business. As a result, his only choice was between unemployment and working for CMR. While other outside contractors may have been employed by more than one parts manufacturer or seller, Fegley was not.

Higgins urges the Court to analogize this case to *Donovan v. Brandel*, 736 F.2d 1114 (6th Cir.1984), in which the Court of Appeals for the Sixth Circuit held that migrant pickle pickers were independent contractors not subject to the FLSA. However, the facts of this case distinguish it from *Brandel*. In that case, the district court found that Brandel relinquished a significant amount of supervisory control to the migrant workers by allowing them to essentially manage the harvest. *Id.* at 1119. Higgins did not relinquish a similar amount of control here, providing Fegley and the other part fabricators with a mold and blueprints for each part. In addition, the district court in *Brandel* found that the migrant workers could increase their remuneration by proper management of the pickle fields. That is, by harvesting the pickles properly, they would maximize their compensation. *Id.* at 1119. Fegley had no such opportunity. No matter how carefully he fabricated the parts, he could not increase his compensation. Finally, the district court in *Brandel* found that the migrant workers were skilled workers because they had mastered certain methods of maximizing production and because they supervised their own field labor. *Id.* at 1117–18. Here, there were no methods of maximizing production to be mastered, and,

other than Higgins's quality checks, Fegley supervised himself.

The Court also notes that the *Brandel* decision has been criticized by other courts. *See, e.g., Secretary of Labor v. Lauritzen,* 835 F.2d 1529, 1536 (7th Cir.1987) (holding that migrant pickle pickers were subject to the FLSA). Indeed, Judge Easterbrook's concurrence in *Lauritzen* suggests the adoption of a bright line standard for FLSA cases rather than a balancing of factors. *Id.* at 1545. According to Judge Easterbrook, migrant farm hands should all be treated as employees under the FLSA, "without regard to the crop and contract in each case." *Id.* While the Court does not abandon the test applied in *Brandel* and *Halferty,* it acknowledges the utility of Judge Easterbrook's approach in cases such as this one.

Fegley was clearly a homeworker—except when he worked in a place provided by Higgins, which made his situation even more like that of an employee and even less like that of an independent contractor. As Fegley points out, homeworkers have long been considered to be employees under the FLSA. *See, e.g., Walling v. American Needlecrafts, Inc.,* 139 F.2d 60 (6th Cir. 1943). Following Judge Easterbrook's suggestion, it makes some sense to say that the FLSA should apply to homeworkers, regardless of the type of work and the contract under which they work. Evaluating a worker's economic reality is a fancy way of asking what the worker's job is like. A court need not rely on rote application of a balancing test in order to answer such a simple question. Fegley was a homeworker and should be considered to be an employee of CMR.

■ As a last gasp argument, defendants assert that Fegley's claims for overtime while employed by CMR are unsubstantiated and must be dismissed. Although the Court agrees that the record contains little other than Fegley's self-serving testimony as to the hours that he worked, that is not enough to grant summary judgment. Defendants' contention that Fegley cannot prove and does not know what hours he worked only shows the existence of a disputed issue of material fact. In order to convince the Court to grant summary judgment, defendants would have to make some showing that Fegley did not work overtime for CMR rather than merely contesting his claim that he did work overtime. They have made no such affirmative showing but will have an opportunity to do so at a trial on Fegley's damages.

### B.

■ Defendants concede that the FLSA applies to Fegley's employment with Foremost. However, they again argue that Fegley's claims for overtime are unsubstantiated and must be dismissed. The Court disagrees. While the number of hours worked by Fegley may be subject to considerable dispute, defendants have not shown that, viewing the facts and all inferences to be drawn from them in the light most favorable to Fegley, *SEC v. Blavin,* 760 F.2d 706, 710 (6th Cir.1985), that a reasonable jury could not find that he worked overtime hours for which he was not compensated. In particular, the Court finds that the affidavit of Gregg Rickert, Plaintiff's Exhibit T, contains sufficient information to create a genuine issue of material fact necessitating the denial of summary judgment. The affidavit states: "Mr. Fegley worked over 40 hours when the rest of the shop did. With the exception of about six weeks, overtime was worked in each of the weeks from April 1988 ... until April 1989." This is enough to send the matter to trial on the damages issue.

### IV.

■ Based on the foregoing, Fegley's motion for summary judgment on the issue of liability under the FLSA is GRANTED, except as to defendant Higgins. Before judgment can be entered against Higgins, it must be shown that an alter ego theory permits Fegley to seek judgment against him personally for the wrongs of his companies. Fegley argues that because of Higgins's control over and involvement in CMR, CMRA, and Foremost, he is jointly

and severally liable for unpaid wages under the FLSA.[2] The Court agrees.

 Where a single person controls and guides several business entities, and where that person is the only one who can authorize compliance with the FLSA, the individual is subject to joint and several liability. *Donovan v. Grim Hotel,* 747 F.2d 966, 972 (5th Cir.1984). Here, there can be no doubt that CMR, CMRA, and Foremost are all creatures of Higgins, subject almost entirely to his control. Accordingly, summary judgment on the issue of liability under the FLSA is also GRANTED against Higgins.

SO ORDERED.

---

**2.** Because the Court finds both CMR (and its successor CMRA) and Foremost liable for unpaid wages for the periods from January 1, 1988 to May 31, 1988 and June 1, 1988 to April 3, 1989, respectively, it need not reach the issue of whether CMR and Foremost are a common enterprise for purposes of the FLSA.